122 F.3d 1172
 97 Cal. Daily Op. Serv. 6498, 97 Cal. Daily
Op. Serv. 6503,
97 Daily Journal D.A.R. 10,604
George Ronald WALTERS, Petitioner-Appellant,
v.
Jack McCORMICK, Respondent-Appellee.
 No. 94-35684.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 18, 1995.
Decided March 12, 1997.
Amended Aug. 15, 1997.
 
 Wendy Holton, Helena, Montana, for petitioner-appellant.
 Elizabeth L. Griffing, Assistant Attorney General, Helena, Montana, for respondent-appellee.
 Appeal from the United States District Court District of Montana; Paul G. Hatfield, District Judge, Presiding. D.C. No. CV-91-133-PGH.
 Before: FARRIS, JOHN T. NOONAN, Jr., and HAWKINS, Circuit Judges.
 Opinion by Judge FARRIS; Dissent by Judge NOONAN.
 FARRIS, Circuit Judge:
 
 INTRODUCTION
 
 1
 George Ronald Walters appeals the denial of his habeas corpus petition. Walters was convicted by a jury of sexual assault and of sexual intercourse without consent. He challenges: (1) the admission at trial of the videotaped testimony of the victim, then four years old; and (2) the trial court's refusal to permit certain cross-examination of the victim's mother.[1] We affirm.[2]I.
 
 
 2
 Admission of the testimony of the child victim, K.C., is an evidentiary issue that the Montana trial court addressed under Montana law. We do not review the admission for error; "we may only consider whether [Walters's] conviction violated constitutional norms." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991).
 
 
 3
 Walters argues that K.C. was incompetent to testify, and that admitting her testimony therefore violated his rights to confrontation of witnesses and due process. Walters directs the court to the trial transcript, noting correctly that the child's testimony was riddled with inconsistencies and did not comprise a clear, unequivocal narration of events. Walters also observes that K.C.'s responses to questions in her testimony and her competency hearing were not consistently truthful, and that she appears to be easily manipulatable. He concludes from these observations that K.C.'s testimony should have been excluded.
 
 
 4
 Regardless of Walters's observations, his legal conclusion is flawed. K.C. was not an ideal witness. Her descriptions of events varied, depending primarily on who was questioning her. She testified both that Walters had molested her, and that her mother had invented the story. She testified that God smiles when you tell the truth, but that sometimes he wants you to lie. A finder of fact might well look with scepticism on her testimony, but that is a question of weight, not admissibility.
 
 
 5
 Walters argues that any "confrontation" of a witness who is as vacillatory and manipulatable as K.C. cannot be meaningful for purposes of the Confrontation Clause. Walters cites no direct precedent for this novel proposition. We reject it.
 
 
 6
 "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (per curiam) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)). When a witness gives "testimony that is marred by forgetfulness, confusion, or evasion .... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination." Fensterer, 474 U.S. at 22, 106 S.Ct. at 295. Walters had such an opportunity.
 
 
 7
 Walters also argues that K.C.'s testimony should not have been admitted because she did not demonstrate an appreciation of the duty to tell the truth. K.C. may not have understood the oath she took, and she was not subject to any penalty for perjury. Where out-of-court statements are offered into evidence, "[c]onfrontation ... insures that the witness will give his statements under oath--thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (dictum). However, it is the "literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." Id. at 157, 90 S.Ct. at 1934-35. K.C.'s testimony was not hearsay, and therefore does not implicate the Confrontation Clause's "primary object": that an accused not be convicted on the basis of "depositions or ex parte affidavits." See id. (quoting Mattox v. United States, 156 U.S. 237, 242-43, 15 S.Ct. 337, 339-40, 39 L.Ed. 409 (1895)).
 
 
 8
 Incapacity to understand the duty to testify truthfully does not automatically offend the Confrontation Clause when the witness in question is a young child. At least where, as here, there is reason to believe that the incriminating testimony will be truthful, a young child may constitutionally be a witness. K.C. had described Walters's acts in graphic detail immediately after the events occurred.[3] That description was delivered to three persons including the defendant's wife, whom no one has suggested had a motive to coach the child or to misrepresent what she said. K.C.'s testimony, which had already been videotaped prior to the competency determination, comported with her initial description of the event. A physical examination of K.C. immediately following the event provided expert medical testimony corroborating the fact of abuse.
 
 
 9
 The Confrontation Clause is not merely a mechanical test, and "[t]here are circumstances that excuse compliance with the right of confrontation." Maryland v. Craig, 497 U.S. 836, 844 & 850, 110 S.Ct. 3157, 3162-63 & 3166, 111 L.Ed.2d 666 (1990) (quoting Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 107-08 (1972)). Even the right to confront one's accuser face-to-face may "give way to considerations of public policy and the necessities of the case" where the testimony of a young child abuse victim is concerned. Id. at 849, 110 S.Ct. at 3165, quoting Mattox, 156 U.S. at 243, 15 S.Ct. at 340. No federal court has held that the Constitution places limits on allowing even the youngest child to testify at trial. See Stincer, 482 U.S. at 742 n. 12, 107 S.Ct. at 2665 n. 12 (observing that several states impose no competency requirement); see also FRE Rule 601 ("[e]very person is competent to be a witness" except as otherwise provided; no provision for determining competency of children).
 
 
 10
 "All that the Sixth Amendment demands [is] 'substantial compliance with the purposes behind the confrontation requirement.' " Ohio v. Roberts, 448 U.S. 56, 69, 100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1980) (quoting Green, 399 U.S. at 166, 90 S.Ct. at 1939), limited on other grounds, White v. Illinois, 502 U.S. 346, 353-54, 112 S.Ct. 736, 741-42, 116 L.Ed.2d 848 (1992). The Clause's "central concern" is that evidence be "subject[ed] to rigorous testing ... before the trier of fact." Craig, 497 U.S. at 845, 110 S.Ct. at 3163. A primary theme of Walters's cross-examination of K.C. was her willingness to lie, and the jury saw that cross-examination. Because Walters was allowed to make the jury fully aware of the child's arguable incapacity, the Confrontation Clause was satisfied.
 
 
 11
 Walters also contends that the admission of the child's testimony violated due process. Where state or federal law provides that a competency determination must be made, failure to conduct an appropriate hearing implicates a defendant's due process rights. Sinclair v. Wainwright, 814 F.2d 1516, 1522-23 (11th Cir.1987) (competency of insane witness); see Stincer, 482 U.S. at 745, 107 S.Ct. at 2667 (due process claim arising out of exclusion from child's competency hearing). After a defendant raises a colorable objection to the competency of a witness, the trial court must perform "a reasonable exploration of all the facts and circumstances" concerning competency. Sinclair, 814 F.2d at 1523.
 
 
 12
 At the beginning of his trial Walters argued that K.C. was not competent to testify because she either did not know what truth was, or did not feel obligated to tell the truth. After this objection, the court conducted a lengthy hearing on K.C.'s competency under Montana law. The court questioned K.C., and also invoked the assistance of a child psychiatrist, who testified that K.C.'s responses had to be interpreted with care, but that she did not lie. Upon questioning by the psychiatrist, K.C. testified that she told the truth. At various times K.C. also testified that she sometimes did not tell the truth. However, our concern is solely whether the trial court conducted a meaningful hearing. The court inquired extensively into the matter and heard substantial evidence indicating that K.C. was competent. The court then exercised its discretion in admitting the testimony. See State v. Eiler, 234 Mont. 38, 762 P.2d 210, 214 (1988) ("Witness competency is within the discretion of the trial court"). There was no due process violation.
 
 II.
 
 13
 Walters's second contention is that the trial court improperly precluded him from cross-examining the victim's mother about accusations of abuse that the mother had previously made against her own father. Walters argues that this ruling denied him the opportunity to present his "sole means of defense" and to confront one of the witnesses against him. We reject this argument.
 
 
 14
 Walters contends that "[h]is theory of the case, from the inception, was that the child's maternal grandfather, not he, was the guilty party." To support this theory Walters attempted to introduce evidence at trial that K.C.'s mother had made prior accusations of abuse against her own father (K.C.'s grandfather), and then withdrawn the charges. The proffered relevance of this evidence was that "the alleged victim has had contact with [the maternal grandfather], ... he has taken care of her on occasion." Walters also offered to prove that "the mother could have told the child not to identify [the maternal grandfather as the one who had abused her]." The trial court precluded inquiry into K.C.'s mother's history, ruling that the proffered evidence would have no probative value.
 
 
 15
 When considering a claim that the exclusion of evidence denied a defendant his due process rights, we consider "the probative value of the evidence on the central issue." Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.), amended on other grounds, 768 F.2d 1090 (1985) (listing factors for consideration) (citing Perry v. Rushen, 713 F.2d 1447, 1452-53 (9th Cir.1983), cert. denied, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984)), cert. denied, 475 U.S. 1048 & 1049, 106 S.Ct. 1269 & 1271, 89 L.Ed.2d 577 & 579 (1986). The proffered evidence would not have been probative. It would not have supported Walters's theory of the case. The State presented the testimony of a physician that abuse had occurred within several hours of her examination of K.C. Walters offered no evidence to rebut that testimony, and he did not and does not now contend that K.C. had contact with her maternal grandfather on that night. "Evidence of third-party culpability is not admissible '... [unless it is] coupled with substantial evidence tending to directly connect that person with the actual commission of the offense.' " People of the Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir.1993) (applying Federal Rules of Evidence) (quoting Perry, 713 F.2d at 1449). There was no such evidence. The exclusion of tangential evidence of something that may have happened at a different time and place does not constitute a due process violation.
 
 
 16
 We are not persuaded by Walters's argument that K.C.'s mother's prior accusations against her own father gave her "a motive to testify falsely and to influence the child ... so as to shield her own father from suspicion." Walters argues that "[t]he partiality of a witness is subject to exploration at trial." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). However, "a trial court may ... impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take into account ... confusion of the issues ... or interrogation that [would be] ... only marginally relevant." Olden v. Kentucky, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (per curiam). Walters has not explained how a history of abuse, or of false accusations of abuse, would constitute "a motive to testify falsely." The evidence would not have been relevant, and Davis is therefore inapplicable.
 
 
 17
 Further, the record does not support Walters's contention that K.C.'s mother fabricated the story. There was unrebutted medical evidence that abuse occurred on the night in question. It is uncontested that the child's underpants were found by Walters's wife in Walters's bed. The victim told her parents about the abuse immediately upon their arrival at Walters's house. The record contains more than substantial evidence, much of it not discussed herein but all well known to the parties, that Walters committed the crimes with which he was charged. The record also contains no indication that anyone else could have committed the act. The trial court did not err in concluding that the proffered evidence was not sufficiently probative to justify its admission.
 
 
 18
 AFFIRMED.
 
 NOONAN, Circuit Judge, dissenting:
 
 19
 The first question presented on this appeal of the district court's denial on the merits of Ron Walters' petition for habeas corpus is whether he was denied rights secured by the Fourteenth Amendment and by the Sixth Amendment as incorporated by the Fourteenth Amendment when the prosecutor was permitted to present to the jury the videotaped testimony of a child who Walters contended was incompetent to be a witness. I quote relevant portions of the voir dire in which the court attempted to determine this competency:
 
 
 20
 The Court: Do you know what it means to tell the truth?
 
 
 21
 KC: (Witness shakes head in a negative manner)
 
 
 22
 The Court: Do you know what a lie is?
 
 
 23
 KC: (Witness shakes head in a negative manner)
 
 
 24
 . . . . .
 
 
 25
 The Court: How will I get at whether she does know the difference between truth and a lie. Do you believe in God, do you know what God is?
 
 
 26
 KC: (Witness nods head in an affirmative manner)
 
 
 27
 . . . . .
 
 
 28
 The Court: You believe there is a God?
 
 
 29
 KC: And Santa gave the guy a dollar at my house
 
 
 30
 . . . . .
 
 
 31
 The Court: Do you know when you say something that happened when it's true?
 
 
 32
 KC: (Witness shakes head in a negative manner)
 
 
 33
 The Court: When you say something that didn't happen?
 
 
 34
 KC: No.
 
 
 35
 . . . . .
 
 
 36
 The Court: When you say something that isn't true--do you know what true is; do you know what--when you tell what is true?
 
 
 37
 KC: (Witness shakes head in a negative manner)
 
 
 38
 . . . . .
 
 
 39
 The Court: And what is the difference between the truth and a lie?
 
 
 40
 KC: Somebody hits me.
 
 
 41
 . . . . .
 
 
 42
 The Court: Do you tell lies?
 
 
 43
 KC: (Witness shakes head in a negative manner)
 
 
 44
 The Court: You don't? What do you tell?
 
 
 45
 KC: Nothing.
 
 
 46
 . . . . .
 
 
 47
 The Court: Your shoes are pink and white. What color are your pants?
 
 
 48
 KC: Red.
 
 
 49
 The Court: When I say they are black, what is that?
 
 
 50
 KC: A lie.
 
 
 51
 The Court: That's a lie. Do you know what God does when you tell a lie?
 
 
 52
 KC: I don't know.
 
 
 53
 The Court: Does he know--do you know what you are supposed to do?
 
 
 54
 KC: What?
 
 
 55
 The Court: What he wants you to do?
 
 
 56
 KC: What?
 
 
 57
 The Court: Do you know?
 
 
 58
 KC: (Witness shakes head in a negative manner)
 
 
 59
 The Court: He doesn't want you to tell lies, does he?
 
 
 60
 KC: Sometimes he does.
 
 
 61
 The Court: What does he want you to do?
 
 
 62
 KC: I don't know.
 
 
 63
 The Court: What did she say?
 
 
 64
 Mr. Donohoe: She said sometimes God wants you to tell lies.
 
 
 65
 The Court: Do you think God wants you tell lies sometimes?
 
 KC: (Nods head in affirmative manner)
 
 66
 The Court: Why do you say that?
 
 
 67
 KC: Because.
 
 
 68
 . . . . .
 
 
 69
 After an interruption for other proceedings, the competency hearing resumed.
 
 
 70
 The Court: I haven't ruled that this child is incompetent. From my own personal opinion, she is competent. But I want to make a record that substantiates that thinking, and in some of the responses of the little girl this morning weren't good, you know. So I just want to clear up those things and I thought maybe if that psychiatrist could give me some questions that would be down to that child's intellectual level where I could get some response from her, you know, it would help to qualify her.
 
 
 71
 Janet Hossack, a psychologist, was then sworn.
 
 
 72
 The court said to Hossack: In order to qualify her [KC] as to competency to be a witness, I have to establish whether she knows the difference between truth and falsity, whether she knows the difference between the truth and a lie, and being that she is four years of age, I don't think the questions that I am propounding to her are eliciting responses that may be you could give me.
 
 
 73
 I read your report and you have concluded that she knows the difference between truth and falsity, and I was wondering to get down to her intellectual level, what questions should be asked of her as to her competency.
 
 
 74
 Hossack: ...She is preoperational, which means there are many things in her life we call fantasy that will probably in a court of law sound like--
 
 
 75
 The Court: You call what?
 
 
 76
 Hossack: Fantasy. The last I talked to her mother and her, she didn't like to sleep in her own bed because of monsters in her own bed.
 
 
 77
 That is to us a fantasy. To her it's very real. I do not call that as having anything to do with the kinds of truth we are looking for.
 
 
 78
 But we have to--our questions have to be, therefore, extremely concrete.
 
 
 79
 . . . . .
 
 
 80
 Hossack: If I told you it was nighttime out, what would you say?
 
 
 81
 KC: I would say okay.
 
 
 82
 Hossack: You would say okay? Look outside, is it nighttime?
 
 
 83
 KC: No.
 
 
 84
 Hossack: What is it?
 
 
 85
 KC: It's morning.
 
 
 86
 Hossack: It's daytime. See this is the other thing that happens, when an authority figure comes and says it's nighttime, she would say okay because the authority figure said so. So this is something we have to watch out for.
 
 
 87
 . . . . .
 
 
 88
 The Court: If your mother walked across the room?
 
 
 89
 KC: No let's call grandma--
 
 
 90
 Hossack: If your mother--what did you say, call her grandma?
 
 
 91
 KC: (Witness nods head in affirmative manner)
 
 
 92
 Hossack: See what we are running into? This child doesn't lie, but she doesn't talk the truth very straight. Children don't make up things, except monsters. But they don't make up what happened. But they are perfectly willing to let grown ups make the rules.
 
 
 93
 And this is the problem, and this may be a problem with competency, I don't know.
 
 
 94
 . . . . .
 
 
 95
 Hossack: And what happened when you said something that wasn't true?
 
 
 96
 KC: I don't know.
 
 
 97
 [A series of questions elicits KC's ability to tell colors such as black from red or white and green].
 
 
 98
 Hossack: Okay. Those are the kinds of things she can tell facts about--
 
 
 99
 The Court: I know. Distinguishing colors is one thing, but, I mean, I have to get out whether she knows the sanctity of an oath, whether she knows the difference between what is true and what is false.
 
 
 100
 [Hossack then asks her if Lisa has green hair and KC says black.]
 
 
 101
 Hossack: What's wrong with me saying she has green hair when she really has black hair?
 
 
 102
 KC: I don't know, ask the judge.
 
 
 103
 Hossack: Do you know what a lie is?KC: (Witness shakes head in a negative manner)
 
 
 104
 Hossack: Did your mom ever talk--
 
 
 105
 Donohoe (Counsel for Walters): I would like the record to reflect she shook her head no when you asked her that question.
 
 
 106
 Hossack: Did your mom ever talk to you about telling the truth?
 
 
 107
 KC: (Witness shakes head in a negative manner)
 
 
 108
 Hossack: Okay. Did anyone before today talk to you about telling the truth?
 
 
 109
 KC: No.
 
 
 110
 Hossack: No?
 
 
 111
 KC: No.
 
 
 112
 . . . . .
 
 
 113
 The Court: The thing is between right and wrong you know. In other words if her testimony is to be made, you know, [in] testing her credibility, they have to know whether she knows the difference between what's true and what's false, what's right, what is wrong, whether she believes in God and if she tells an untruth that God will punish her, and so on, whether she tells the truth, that's the correct thing to do, things like that.
 
 
 114
 Hossack: KC, what's bad?
 
 
 115
 KC: (Witness shakes head in a negative manner)
 
 
 116
 Hossack: Did you ever do anything bad?
 
 
 117
 KC: (Witness shakes head in a negative manner)
 
 
 118
 Hossack: Never in your whole life did you ever do anything bad?
 
 
 119
 KC: (Witness shakes head in a negative manner)
 
 
 120
 Hossack: Did you ever do anything good?
 
 
 121
 KC: (Witness nods head in an affirmative manner)
 
 
 122
 Hossack: What did you do that was good?
 
 
 123
 KC: Playing with Stacey, that's my friend.
 
 
 124
 . . . . .
 
 
 125
 The Court: Can you ask her some questions about whether she knows what she is saying is true, whether what she is saying is false?
 
 
 126
 Hossack: Okay. Did you ever tell something that wasn't true?
 
 
 127
 KC: Yes.
 
 
 128
 Hossack: Can you tell me what it was, do you remember what it was?
 
 
 129
 KC: No.
 
 
 130
 Hossack: Did you ever spill any milk?
 
 
 131
 KC: No.
 
 
 132
 Hossack: Never spilled milk?
 
 
 133
 KC: I never do.
 
 
 134
 Hossack: Do you ever spill juice?
 
 
 135
 KC: No.
 
 
 136
 Hossack: Or cookies on the floor?
 
 
 137
 KC: No.
 
 
 138
 Hossack: You never did anything wrong. We are in real trouble here today. Can you tell me--would you repeat that--what is the difference between right and wrong--is it right to hit?
 
 
 139
 KC: (Witness shakes head in a negative manner)
 
 
 140
 Hossack: Is it right to share?
 
 
 141
 KC: (Witness nods head in an affirmative manner)
 
 
 142
 Hossack: Is it right to spill your milk?
 
 
 143
 KC: (Witness shakes head in a negative manner)
 
 
 144
 Hossack: Is it right not to tell the truth?
 
 
 145
 KC: (Witness shakes head in a negative manner)
 
 
 146
 . . . . .
 
 
 147
 The Court: Ask her if she knows what happens when she doesn't tell the truth or when she tells a lie.
 
 
 148
 Hossack: What happens to people when they don't tell the truth?
 
 
 149
 KC: They get a spanking.
 
 
 150
 . . . . .
 
 
 151
 Hossack: Does God like it when you tell a lie?
 
 
 152
 KC: No.
 
 
 153
 Hossack: Does God like it when you tell the truth?
 
 
 154
 KC: Yes.
 
 
 155
 Hossack: Does God smile when you tell the truth?KC: Yes.
 
 
 156
 Hossack: And so what do you do about the truth?
 
 
 157
 KC: Just tell the truth.
 
 
 158
 The Court: She said she says tell the truth.... And what would happen if you didn't tell the truth?
 
 
 159
 KC: You get a spanking.
 
 
 160
 The Court: That is getting--
 
 
 161
 Hossack: That's what she said before.
 
 
 162
 The Court: That's getting to the point where she knows the difference between what's true and what's false. Yes, I think that's sufficient.
 
 
 163
 The general rule is that the question of competency of a witness is a question for the trial judge who has had the opportunity to see with his own eyes and to hear with his own ears the witness whose competency is challenged. See Wigmore on Evidence (1979 ed. and 1996 supplement) Section 507. In addition to this salutary rule of evidence, when competency is the ruling of a state court and the question is raised on habeas, federal law provides that the writ shall not be granted with respect to any claim adjudicated on the merits unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. p 2254(d)(1) and (2).
 
 
 164
 The factual determination of competency is unreasonable in the light of the evidence presented in the State court proceeding. Clearly established federal law, as determined by the Supreme Court of the United States is unreasonably applied in the state court's interpretation of the Confrontation Clause.
 
 
 165
 Competency can be viewed as a matter of fact or a matter of law. In either case the witness must be competent at the time of testifying not at some later time. K.C.'s competency is to be examined at the time she made the video, not at the conclusion of a hearing in which she was coached by both the psychologist Hossack and by the trial judge as to what truth-telling is.
 
 
 166
 As a matter of fact, K.C. demonstrated her incompetence to have been a witness at the time she made the video. As she tells the court at the competency hearing, she does not know what a lie is, she does not know what it is to tell the truth, she does not know the consequences of not telling the truth. She demonstrates her incapacity by saying it's night when it is day. She demonstrates her incapacity by indicating that she does not tell lies and by declaring that she has never spilled milk, juice or cookies. She demonstrates her incapacity by declaring that God sometimes wants you to tell lies.
 
 
 167
 The helpful psychologist confirms her incapacity by reporting that K.C. fantasizes about monsters in her bed and that K.C. would say day was night "because the authority figure said so." The imagining of monsters in her bed and her liability to manipulation by authority are both highly relevant to her capacity to tell the truth about the assault charged in this case. In Hossack's opinion, K.C. "doesn't talk the truth very straight" or in some cases, at all. K.C. "is perfectly willing to let grown ups make the rules."
 
 
 168
 Near the conclusion of the voir dire the trial judge exclaims, "That is getting to the point where she knows the difference between what is true and what is false. Yes, I think that is sufficient." The judge and Hossack have brought K.C. to this point. They have educated her to give the responses they seek. She is now playing by their rules. The raw, uneducated answers she first gave--she whom no one had ever instructed in truth telling--show her to have been incompetent in fact when she was examined on the videotape. The record of this proceeding does not fairly support the determination of the trial judge if competency is a matter of fact. If competency is a matter of law, a fortiori K.C. fails to quality. She did not know what it was to tell the truth. As the trial judge's own spontaneous comments reflect, she was incapacitated by lack of a conscience requiring her to tell the truth. Nothing in the record of this proceeding supports the conclusion that she did know how to tell the truth at the time she made the video. As a matter of fact and as a matter of law she was not competent to be a witness.
 
 
 169
 Because she did not know what truth-telling is she was not a witness within the meaning of the Sixth Amendment. She could not be subjected to cross-examination within the meaning of the Sixth Amendment. The purpose of cross-examination is not only to test the accuracy of perception and the memory of the witness but to probe the witness's conscience, to discover whether in the story the witness is telling the witness is acting in accordance with the instruction of conscience to tell the truth. A witness who does not know what the truth is cannot be put to cross-examination.
 
 
 170
 It is acknowledged by the parties and by this court that the case is unprecedented. The absence of precedent does not mean that we should decide the case in favor of the prosecution. When the unprecedented event occurs that a child is presented as a major witness in a felony prosecution, and the record made by the trial court shows that she does not know what truth-telling is, we have the duty to determine whether the federal constitutional rights of the defendant have been violated. They have. He has been denied the right to confront the witness against him and to cross-examine.
 
 
 171
 The error cannot be considered harmless. As the prosecutor said in arguing for the admission of the video tape: "Not having the child be there affects the entire outcome of the trial." Moreover, the admissibility of the hearsay repeating the accusations of the trial would also be in doubt. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). If K.C. did not testify herself, her accusation against Ron Walters could come in only under an exception to the hearsay rule; and it could constitutionally have been admitted only if the totality of the circumstances surrounding the making of the statement made K.C. "particularly worthy of belief." Id. at 820, 110 S.Ct. at 3149. This question was not reached at trial because K.C. was permitted to testify on the tape. In any retrial, where K.C. was excluded as incompetent, a serious question would be presented as to whether the hearsay would qualify as admissable evidence. Without the unfair and unconstitutional use of K.C.'s testimony, the prosecution would have had a difficult time proving its case.
 
 
 172
 If the witness is incapable of understanding the duty to testify truthfully, the witness is incompetent. The majority argues that: "Incapacity to understand the duty to testify truthfully does not automatically offend the Confrontation Clause when the witness in question is a young child." Try substituting "insane" for "a young child," or substitute "suffering from Alzheimer's disease." The sentence would be nonsense. What makes it better in its present form? "Being a young child" does not convert capacity to incapacity.
 
 
 173
 The majority concedes that the Confrontation Clause embraces the right to cross-examination. The earliest American cases see that right as constituting its core, see Randolph N. Jonakait, "The Origins Of The Confrontation Clause: An Alternative History," 27 Rutgers L.J. 77, 122 (1995). The Salem Witchcraft Trials were a well-known part of the colonial experience; the new Republic did not want to repeat them. Id. at 135. The Confrontation Clause granted power to the defendant to defend himself by cross-examination. Id. at 164.
 
 
 174
 You cannot cross-examine an idiot, a victim of Alzheimer's, a baby--they cannot understand what they are supposed to do. No more could you cross-examine this child who did not understand what it was to tell the truth. Walters was not denied the right of effective cross-examination. He was denied the right to cross-examine.
 
 
 175
 The "necessities of the case" do not create competency. If your chief witness is incompetent, you do not have a case.
 
 
 176
 In an effort to bolster its unusual doctrine the majority adds that it applies "at least where there is reason to believe that the incriminating testimony will be truthful." I don't see how such a belief would cure the incapacity.
 
 
 177
 In addition, the three things said to give "a reason believe" were contaminated by the contact the child had with her mother, Cindy. The statement to the defendant's wife, the grandmother of the child, was made after the child had been alone with Cindy. The single sentence the grandmother heard was not detailed and was well within the child's capacity to repeat or fabricate. The "consistent" videotape was, of course, made much later after the child had plenty of time to rehearse the story with her mother. Even the so-called physical evidence was inconclusive in itself. The grandmother, a laboratory technician, had immediately examined the bedsheets for blood or semen and found nothing. The pediatrician who examined the child found no semen, no blood, no bruises, no scratches, no stretching of the hymen, only some redness in the inner genitalia. She interpreted this redness as "consistent" with a sexual intrusion, but only after she had been told by Cindy that such an intrusion had occurred. Her interpretation is dependent on Cindy's version; she got no statements from the child. And Cindy herself was a witness of dubious reputation, a witness who had accused her own father of sexual assault and then withdrawn the accusation.
 
 
 178
 The second question presented by Ron Walters' petition for habeas is whether he was denied his confrontation rights by exclusion of evidence pointing to Cindy's father as the probable perpetrator of whatever sexual assault had been inflicted on K.C. The opinion in this case takes the position that the evidence as to Cindy's father would have been irrelevant because of the pediatrician's testimony that the injury to K.C. had taken place a few hours earlier on the evening she was seen by the pediatrician. There was almost no physical evidence. To reach a conclusion of guilt it must be supposed that the jury would have believed the pediatrician's positive testimony that the fugitive reddening of the inner genitalia of K.C. was "consistent" with a sexual intrusion. The defense did not offer an alternative hypothesis from a medical expert. The defense did ask the jurors to use their common sense in deciding whether the pediatrician could really be so certain as to the single cause. Her certainty, she herself acknowledged, came in part from reliance on what Cindy had just told her: that K.C. had just suffered a sexual assault. If the jury had been presented with the evidence the defense sought to introduce as to Cindy's father, it can well be supposed that the jury would not have taken the pediatrician's opinion as dispositive.
 
 
 179
 What the defense sought to offer was Cindy's own statement to the psychologist Hossack that she had been sexually abused by her own father. As the defense later discovered and introduced in a motion for a new trial, when Cindy was fifteen she was the complaining witness against her father alleging that he had raped her. According to what she told Hossack, she recanted on the witness stand due to family pressure. According to the later court records discovered and introduced in the new trial motion, Cindy was then indicted for having filed a false accusation. The defense sought to introduce evidence that despite Cindy's account of sexual abuse by her father, she had on occasion left K.C. in her father's care. The evidence the defense would have introduced would have shown the likelihood of Cindy's father having at some point molested K.C., while nothing in Ron Walters' blameless past indicated that he was capable of such an act. The defense theory--a perfectly good theory if the jury failed to believe the opinion of the pediatrician--was that K.C. on the night in question had recalled abuse by her maternal grandfather and been steered by Cindy to make the accusation instead against the man she called grandpa. The remarkable interest of Cindy's father in the case did emerge, to a degree, at the trial. Cindy stopped at her sister's before taking the child to the hospital. From there she called her own parents and talked to both of them. Her father agreed to meet her at the hospital.
 
 
 180
 The circumstances under which the alleged crimes occurred bear repeating, as well as the circumstances of K.C.'s life that suggest an unstable environment, shifting loyalties, and uncertain family affections. At the age of sixteen, one year after her abortive complaint of rape against her own father, Cindy had K.C. out of wedlock. At some other point in her teenage years Cindy had another child by another man. Rodney Walters, variously identified as an ex-husband and as a boyfriend, left her to go into the Navy but eventually had come back to Montana and was living with her and K.C. The whereabouts of the other infant are not clear. At 6:00 o'clock on the evening of December 28, 1988 Rodney and Cindy went over to the home of Rodney's parents, the Walters, to do some laundry. Only Rodney Walters' mother, Ruth, was home. At about 9:00 o'clock Ruth gave the young couple enough money to go to the movies and, although she was tired and not feeling well and had to get up early for work the next morning, agreed to babysit K.C. while they were out. She knew from experience that K.C. was "a handful", difficult to calm down and difficult to get to sleep and sometimes likely to remove her underwear under her nightgown. At about 10:00 o'clock her husband Ron, the defendant in this case, came home. He had been talking business with a friend and had had two or three beers. His wife asked him to babysit K.C. as she wanted to go to bed. He agreed. She retired to her bedroom where she slept alone because he snored. She did not, however, go to sleep but heard the TV going and got up once and observed her husband and K.C. in the living room. Nothing was amiss. At some point during the evening her husband took off his boots but then put them back on to go out and check some things in his truck. He remained fully dressed. Around 11:00 the television went off and Ruth may have dozed. At 11:30 she again checked on K.C. She looked in her husband's room. The door was wide open. She saw figures on the bed and assumed that K.C. had climbed in to go to sleep with Ron, as she sometimes did with adults. She again checked a little before 12:00 and found nothing unusual. Rodney and Cindy came home shortly after midnight. Rodney entered the bathroom and Cindy, according to her testimony, encountered K.C. in the corridor and heard the accusation against grandpa Ron. At no time did the state make precise at what time the alleged crimes occurred or attempt to explain why Ron Walters was fully dressed or identify the time that would have been safe for him to carry out the unusual crimes of opportunity with which he was charged. When confronted by his son, to whom K.C.'s accusation had been repeated, Ron Walters said: "What kind of a monster do you think I am?" Grammatically he asked a question; in substance, he denied the accusation.
 
 
 181
 If Ron Walters had been accorded the rights guaranteed by the Constitution of the United States to present the evidence supporting his theory of the case and the rights guaranteed by the same Constitution to confront and cross-examine the witnesses against him, a Montana jury would have had a fair chance of determining the denial--in which he has persisted in prison although it prevents his eligibility for a program leading to parole--was truthful. As the trial was conducted, his constitutional rights were denied and the fairness disappeared.
 
 
 
 [1]
 The State contends that Walters has not exhausted his state remedies and that these claims are therefore barred from consideration on petition for habeas corpus. If Walters did fail to exhaust his remedies, that failure arose in part from the district court's ruling that his claims were not barred. The Montana statute of limitations appears to have run while Walters's petition has been considered by the federal courts. We exercise our discretion and reach the merits of the claims. See McCleskey v. Zant, 499 U.S. 467, 490, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991)
 
 
 [2]
 The district court had jurisdiction over the petition pursuant to 28 U.S.C. § 2241. We have jurisdiction over Walters's appeal pursuant to 28 U.S.C. § 2253
 
 
 [3]
 The detail included a description of a physical event-a penis growing erect-that, although related in the language of a three-year-old, was both externally accurate and impossible for K.C. to have fabricated